# WHEELING.

## SNYDER v. LUNSFORD.

### July 21, 1876.

By articles of partnership, for manufacture of carriages, it was agreed that the entire capital stock should be purchased by one partner; that the other was to have no interest or ownership in the capital stock, he giving his personal attention, exclusively, to the business; the net profits and losses were to be equally divided between the partners.—HELD:

That the goods, stock, material and tools of the carriage factory, manufactured by the partnership, or purchased by it, in its business, does not become the property of the partner furnishing the capital, but is partnership property.

A partnership owns certain real estate, to which it has an equitable title; one of the partners, who put in all the capital stock, sells said real estate, without the knowledge of the other, to a purchaser, who had loaned him all the money which he had put in as capital stock, and agreed to take therefor, the partner's individual notes, which had been given to the purchaser for the money so borrowed, and certain notes of the partnership held by the purchaser; and such contract of sale of such real estate, having been entered into, this partner, without the knowledge of his co-partner, induces the holder of the legal title of such real estate, to convey to the purchaser, who knew that enough assets of the partnership would not be left to satisfy the creditors of the partnership, and also that each of the partners were insolvent. —HELD:

That this deed is null and void, as against the creditors of the partnership, and, being fraudulent, it can not be held as a security for the debt of the partnership, due to the purchaser.

Appeal from a judgment of the municipal court of Wheeling rendered March 17, 1875, in a suit therein

pending in said court in which Jacob Snyder was plaintiff, and Lewis Lunsford and others, defendants.

The facts of the case are fully set forth in the opinion of this Court.

The Hon. Gibson L. Cranmer, judge of said municipal court, presided at the trial below.

Messrs. *Russell & Lamb* for the appellant.

Messrs. *Hubbard & Erskine* for the appellee.

GREEN, JUDGE:

Jacob Snyder, on behalf of himself, and all other creditors of Lunsford & Frobe, filed his bill, in the municipal court of Wheeling, in May, 1875, in which he prays the court to declare null and void a deed, made on on the thirteenth day of December, 1873, by Kull and wife, and Reed and wife, to Lewis Lunsford, conveying a house and lot, in the city of Wheeling, and that the same may be sold, by an order of the court, and the proceeds applied to the payment of his debt, and all other debts of Lunsford & Frobe, and account of which funds may be taken.

The facts, from the pleadings, and evidence, appear to be as follows :

On the first day of September, 1871, Thomas Lunsford, and G. A. Frobe, entered into a partnership, under the name of Lunsford & Frobe, "in the manufacturing, altering, repairing, and selling, wagons and carriages, in said city," the partnership to continue for five years, if not sooner dissolved. By the articles of agreement between them, "Lunsford was to furnish, for the carrying on of the business, a capital stock of $5,000," to be supplied from time to time, and "Frobe was to contribute nothing to the capital stock, and was to have no interest or ownership therein." Frobe agreed to give his exclusive personal attention to the business, engaging in none other. The name of the firm was to be used and signed by Lunsford alone, to contracts and agreements of the

firm, and the books of the firm were to be under his exclusive control. Frobe, it was agreed, should draw out of the business of the firm only $10 per week, to be charged to his share of the profits on settlement; and it was further agreed, "that, after the payment of all the expenses of said business, and debts, of every kind, whatever, the net profits of said business, if any, should be equally divided between the parties, share and share alike, and in the event of a loss, there should be a like division of the sum."

The business was conducted, as provided for in this agreement. Lunsford put in, at different times, $5,000, as the capital stock of the firm; this he borrowed of his father, individually, and gave him therefor his individual notes. The business of the shop was conducted by Frobe, who gave it his exclusive personal attention; the financial affairs of the firm were conducted, exclusively, by Lunsford, who, in its management, did not consult with Frobe, borrowing large sums of money in the name of the firm, and for its use, and signing the name of the firm to the promissory notes, without consultation with Frobe. When the firm was dissolved, by mutual consent, on December 12, 1873, there were outstanding of their notes, $2,712, which were endorsed by Lewis Lunsford, for the accommodation of the firm; they were afterwards paid by him. On that day Lunsford completed a sale of all the property of the firm, to Kull, for $9,500. Of the details of this bargain and sale he did not inform Frobe, particularly, till the agreement had been drawn and signed by Lunsford and Kull, when it was presented to Frobe, for his signature, by the drawer of the agreement, who went to the shop for the purpose. Very little was said. Frobe simply signed the agreement. He had not been present at any previous meeting, while this contract was being made, nor was he afterwards present, or consulted, when the business was concluded. This agreement was drawn up in the name of Lunsford & Frobe, and, thereby, Kull agrees to pay them, for "all their

28

goods, stock, materials, and tools, of their carriage factory," $9,500, to be paid as follows: " 1st. By a clear deed of that part of the house owned by Kull and Reed, which is occupied as a milliner store. 2d. In full, for the remainder, $3,000." Reed's consent was obtained to this division of the property the next day, when he signed an endorsement on the back of the agreement, which is in these words: " I hereby consent to the transfer and division of the house and lot owned by me and David Kull, as before stated, to be made to Dr. Thomas Lunsford." This indorsement was dated the same day that the agreement was written, but was not signed by Reed till the next day after the agreement had been signed by Frobe. When it was signed by Frobe, this indorsement was written, but had not been signed. When the agreement of sale was signed by Frobe, it was read over to him twice, by the drawer of the paper, but it does not appear that the indorsement of the consent of Reed, which had not then been signed, was read to him, but; on the contrary, it appears that it was not. The next day, when the deed by Kull and wife, and Reed and wife, to be made by the terms of this agreement, was about to be drawn, Lunsford directed it to be drawn to his father, Lewis Lunsford. Kull denies that he heard any such direction, and says, not knowing Lunsford's first name, he thought that it was being executed to Lunsford himself. Reed, however, says he understood that the deed was to be made, by direction of Lunsford, to his father, and that Kull told him so. Other testimony, also, shows that Thomas Lunsford, in the presence of Kull, gave direction to have the name of his father inserted as grantee. Frobe had no knowledge of this till after the deed had been executed. Thomas Lunsford states, that he agreed with his father, before the sale to Kull, that, if he made this sale, he would take the house for the $5,000 he owed him, and give up the notes therefor. Lewis Lunsford's testimony is vague in reference to this agreement between him and

his son. He says he was to take the house at whatever price was given for it by Kull, the price to go as far as it would in paying him in full. In their answers, they both say, that the payment for the house was to go on the entire indebtedness of the firm, and of Thomas Lunsford to Lewis Lunsford. The agreement was probably but a vague conversation, and it was never mentioned to Frobe. The firm, at that time, had not the means to repay the $5,000 of capital put in by Lunsford, and to pay off its debts, and the individual partners were insolvent.

This was all known to Lewis Lunsford. The court, in March, 1875, heard the cause, and adjudged that the conveyance to Lewis Lunsford be set aside, and declared null and void, as to the complainant; and the cause was referred to a commissioner to take an account of the debts of the firm, due at the time of the conveyance, and and the amounts and priorities of the liens on the house and lot, and of the rents and profits, taxes, repairs, and insurance of the same since the conveyance. From this decree, Lewis Lunsford has appealed.

The *first* question arising in this case is, to whom did the "goods, stock, materials, and tools of the carriage factory" belong? They are claimed to have belonged to Thomas Lunsford alone, and not to the partnership. This claim is based on the provisions in the articles of partnership, whereby it was agreed that Lunsford should furnish, from time to time, all the capital stock, $5,000, for carrying on the business, and that Frobe was to contribute nothing to the capital stock, and was to have no interest or ownership therein, and *Smith v. Watson*, 2 B. & C. 401; *Smith v. Smith*, 5 Ves. 189; *Exparte Ruffin*, 6 Ves. 119; *Exparte Williams*, 11 Ves. 3; *Exparte Hamper*, 17 Ves. 404; *Blanchard v. Coolidge*, 22 Pick., are referred to as sustaining this proposition. These cases all differ essentially, from the one before us; and we think, if there had been an express agreement in the

articles of co-partnership that all this property should be regarded as Lunsford's alone, and none of it as belonging to the partnership; that such agreement, under the circumstances developed in the case, would be inoperative to make this the sole property of Lunsford, against the creditors of the firm. But it is unnecessary to decide what effect such an agreement would have had, as it is obvious that no such agreement was made in this case. The agreement that Frobe was to have no interest or ownership, in the capital stock put in by Lunsford, is very different from an agreement that he should have no interest in the carriages made by him, and under his supervision, or in the materials and stock purchased by the partnership to carry on its business. The true meaning of this provision, in the articles of partnership, is, simply, that on the dissolution of the firm, the $5,000 of capital stock, put in by Lunsford, was to be regarded as belonging to him alone, and a division should be made only of the profits and losses, excluding this $5,000, which was to be returned first to Lunsford. Such a provision was essential to prevent controversies between the partners, when the partnership was dissolved. Coll. on Part., Sect. 167. The partners seem to have so understood their agreement, for when this property was sold to Kull, it was in the agreement of sale, prepared under the direction of Lunsford, expressly declared to be the property of the firm. This being the case, on the execution of this agreement of sale, the firm of Lunsford & Frobe at once became the owners, by an equitable title, of the house and lot in controversy, and it follows, as a matter of course, that one of the partners, Lunsford, could not, without the consent or knowledge of the other, dispose thereof to an individual creditor of himself, in satisfaction of his individual debt. It is doubtful, under the circumstances of this case, the partnership being after such disposition, insolvent, and each of the members of the firm, and this known to the creditor of the individual partner, whether a disposition of this property, made by

the consent of both partners, in satisfaction of a debt of one of the partners, would be held valid against the partnership creditors; though the opinion of Judge Daniel, in *Marks v. Hill*, 15 Gratt. 419, seems to give considerable countenance to the validity of a disposition of partnership property to the satisfaction of an individual debt, under circumstances resembling somewhat the present case; but he based his opinion expressly, on the ground that it was the joint act of all the partners. We do not decide what would have been the effect upon this deed to Lewis Lunsford, if the consent of both the partners to its being made had been obtained. Such consent in this case was neither asked nor given, nor was any consent given by Frobe that the deed should be made to his partner, Lunsford. The article of agreement with Kull, which Frobe signed, in effect, requires the deed to be made to Lunsford and Frobe, and he never assented, or was asked to assent, to its being made otherwise.

It is, however, insisted, that Lewis Lunsford, having the legal title to this house and lot, and being guilty of no fraud, the Court ought not to set aside this deed, *in toto*, but that it should hold it as giving him a security for the $2,712 due to him from the firm; and to the payment of which, one of the partners could have properly appropriated the assets of the firm, without the consent of the other. It is, in the first place, questionable from the evidence, whether the debt of $5,000, due from Thomas Lunsford to his father, was not the sole consideration of this deed. Thomas Lunsford so states in his evidence, and though Louis Lunsford so states the agreement, that we may infer that price of the house and lot was to be applied to both the debt of $5,000, and also to the debt due from the firm of $2,712, yet it is obvious from the statements of both of them, that there was really no distinct agreement between the father and son; that this $2,712 was to be paid out of the price of said house and lot; on the contrary, they seemed to have expected to pay it out of other assets of the firm; but

even had this agreement been established, still, as Lewis Lunsford, knowing that in so doing he rendered the firm insolvent, and that both of the partners were insolvent, received a deed to satisfy a private debt due from his son to him, without obtaining the assent of the other partner, he was thereby, in contemplation of law, guilty of a fraud, and the deed must be set aside *in toto*, and can not be held as a security for the $2,712, claimed to have been paid by him for the firm, even though, by the agreement between him and the son, a portion of the price of this house and lot was to be applied to the payment of this firm debt of $2,712. *Lewis v. Caperton*, 8 Grat. 165; *Garland v. Rives*, 1 Rand, 282. This debt may, under the decree which has been rendered, if properly proved, be audited in favor of Lewis Lunsford among the debts of the firm, but it has acquired no priority by the deed to him.

We are, therefore, of opinion that there is no error in the decree complained of, and that the decree of the municipal court of Wheeling, of March 17, 1875, be affirmed with costs in this court, and $30 damages.

Haymond, President, and Moore, Judge, concurred.

Edmiston, Judge, absent.

DECREE AFFIRMED.